**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

JOELLE SKAF,


Plaintiff,                                                          Index No.:

                                                                    **PLAINTIFF'S COMPLAINT**
v.
                                                                    **JURY TRIAL DEMANDED**
GOOGLE, LLC,

Defendant.


_____x

     Plaintiff Joelle Skaf ("Plaintiff Skaf"), by and through her attorneys, Julien Mirer &

Associates, PLLC hereby make the following claims for damages against, GOOGLE, LLC and

alleges, upon knowledge as to herself and upon information and belief as to other matters, the

following:

<u>**NATURE OF ACTION**</u>

    1.  This is a civil action seeking monetary damages, civil penalties, punitive damages, and

injunctive relief to enforce Title VII and the New York City Human Rights Law, to redress the

injuries Plaintiff has suffered as a result of being discriminated against by Defendant, on the basis

of gender, her Arab ethnicity, her association during her employment with people of Palestinian

national origin during the Gaza War; and to redress being retaliated against, including wrongfully

terminated, due to her protected activities protesting discrimination.

    2.  Among her protected activities, Plaintiff also protested the unsafe working conditions that

she and others who made similar protests experienced as a result of decrying what she reasonably believed was Google's complicity in the ongoing illegal genocide in Gaza, which protected activities led to her retaliatory wrongful termination.

3.   Plaintiff further brings claims for wrongful termination under the New York Labor Law Whistleblower Provision NYLL 740 seeking monetary damages and civil penalties for retaliation for protesting what she reasonably believes to be Google's complicity in and unlawful technical support for Israel's genocide against Palestinians in Gaza through Google's work on "Project Nimbus."

4.   Further, Plaintiff also raises common law claims for breach of contract, negligent infliction of emotional distress, and defamation by the acts of Defendant to harass her and terminate her employment for discriminatory reasons and/or on account of her protected activities.

5.   Additionally, this lawsuit seeks redress for gender discrimination Plaintiff experienced in the years leading up to her termination, where she received less compensation than similarly situated male peers and was denied a promotion for which she was qualified in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, 215; New York's Equal Pay Act, NYLL §§194, 215, and the New York City Human Rights Law.

## JURISDICTION AND VENUE

6.   Jurisdiction is proper as this Court has federal question jurisdiction pursuant 28 U.S.C. §1331 as Plaintiff brings claims under Title VII, 42 USC 2000e-(5)-(f), and has exhausted her administrative remedies at the Equal Employment Opportunity Commission and has received a right to sue letter dated April 23, 2025.

7.   There is additionally jurisdiction pursuant to 28 U.S.C. §1332 as the parties are citizens of

different states and the amount in controversy is in excess of $75,000.

8.  Defendant is subject to personal jurisdiction in the State of New York since Defendant performs business there.

9.  Venue is proper in this District because Defendant conducts business in this Judicial District, and many of the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

10. Plaintiff Joelle Skaf is an adult female resident of New York County, New York.

11. Plaintiff is a person of Arab ethnicity.

12. Plaintiff, in her employment, associated with others of Arab ethnicity including those of Palestinian national origin.

13. Plaintiff was employed by Defendant from January 12, 2009, to April 17, 2024.

14. Defendant Google, LLC ("Google") is a global technology company.

15. Defendant is a Delaware corporation with its principal place of business in Mountain View, California.

16.  During all relevant times, Defendant was Plaintiff's employer within the meaning of all applicable statutes relevant to this action.

17.  During all relevant times, Defendant employed Plaintiff in New York, New York.

18. Throughout the relevant period, Google employed thousands of employees in New York and throughout the country.

## BACKGROUND

19. Plaintiff Skaf is a highly qualified software engineer. She holds a bachelor's degree in

Computer and Communications Engineering from the American University in Beirut and a PhD

in Electrical Engineering from Stanford University.

20. Plaintiff was hired by Google on January 12, 2009, as a Level 4 Software Engineer. Since

her hire, until her protected activity leading to her termination, she was promoted two levels.

21. In 2011, Plaintiff was promoted to Level 5 Senior Software Engineer.

22. In 2015, Plaintiff was promoted to Level 6 Staff Software Engineer. While attaining a

Level 6 position she was thereafter mis-leveled as she was given work associated with

higher level employees but paid as a Level 6.

23. Despite this failure to promote, since her hire, and until engaging in protected activity

leading to her termination, Plaintiff received highly positive performance evaluations.

24. At all times until Plaintiff's protected activity on behalf of herself and other Arabs and

until her association during her employment with people of Palestinian national origin during the

Gaza War, she received highly positive ratings of "Exceeds Expectations", "Exceeds

Expectations", "Strongly Exceeds Expectations," and "Outstanding Impact" through the end of

2023.

## FACTUAL ALLEGATIONS

25. In January 2018, Plaintiff Skaf was assigned to Google's Cloud computing division.

26. Plaintiff initially started as an individual contributor on the team and then became tech

lead in February 2020.

### May 2021: Plaintiff Speaks Out Regarding Project Nimbus

27. In May 2021, Google and Amazon won the bid for Israel's Project Nimbus, a contract to

provide cloud computing infrastructure, artificial intelligence and other technology services to the Israeli government and its military, including and Israeli military efforts in the occupied territories. Around the time the Nimbus contract was signed Plaintiff had raised concerns around Nimbus in connection with Google's AI Principles.

28. By way of background, on June 7, 2018, Suchai Pindar, Google's CEO published a set of AI Principles applicable to Google, which state in relevant part:

"AI applications we will not pursue[...] we will not design or deploy AI in the following application areas:

1. Technologies that cause or are likely to cause overall harm.  Where there is a material risk of harm, we will proceed only where we believe that the benefits substantially outweigh the risks, and will incorporate appropriate safety constraints.
2. Weapons or other technologies whose principal purpose or implementation is to cause or directly facilitate injury to people.
3. Technologies that gather or use information for surveillance violating internationally accepted norms.
4. Technologies whose purpose contravenes widely accepted principles of international law and human rights". See https://blog.google/technology/ai/ai-principles/

29. On May 20, 2021, in advance of a regular town hall meeting, a colleague brought up Project Nimbus in a question posted to the town hall's message board called "Dory". (Dory is an internal Google question board meant to spark engaging conversations between speakers and attendees.) They asked the company what was being done to prevent Google software from being used by Israel to kill Palestinians. Plaintiff added a comment seeking to further an internal dialogue regarding whether Project Nimbus was inconsistent with the Company's AI Principles:

"[….]Googlers are entitled to hear their leaders' reasoning behind contracts that could contravene AI principles ("Technologies that cause or are likely to cause overall harm", "Technologies that gather or use information for surveillance violating internationally accepted norms", "Technologies whose purpose contravenes widely accepted principles of

5

international law and human rights) given that Israel is now labeled an apartheid state by Human Rights Watch and B'Tselem."

30. Plaintiff essentially argued that the Company should not perform contracts that could be implicated as war crimes or aiding and abetting violations of international law, consistent with their AI principles.

31. International law organizations had noted that Project Nimbus implicated various violations of international law. As the UN Special Rapporteur Francesca Albanese found:

> "Microsoft, Alphabet and Amazon grant Israel virtually government-wide access to their cloud and AI technologies, enhancing data processing, decision-making and surveillance/analysis capacities. In October 2023, when Israel's internal military cloud overloaded, Microsoft Azure and Project Nimbus Consortium stepped in with critical cloud and AI infrastructure. Their Israel-located servers ensure data sovereignty and a shield from accountability, under favourable contracts offering minimal restrictions or oversight. In July 2024, an Israeli colonel described cloud tech as "a weapon in every sense of the word", citing these companies." (see: https://www.un.org/unispal/document/a-hrc-59-23-from-economy-of-occupation-to-economy-of-genocide-report-special-rapporteur-francesca-albanese-palestine-2025/)

32. Previously employees have engaged in a similar dialogue regarding an AI contract called Project Maven and the Company had decided not to move forward with the contract.

33. In response to these questions regarding Project Nimbus, Google did not reassess its decision to move forward.

34. Rather, in response, Google informally flagged Plaintiff, but at this time she was not officially reprimanded for raising the violations of its policy and of international law implicated by the Nimbus contract.

35. Thereafter in October 2021, Plaintiff signed a "drop Nimbus petition."

**February 2022-April 2024: Plaintiff Received Disparate Pay For Performing Equal Work to Her Male and/or Non-Arab and/or Non-Palestinian Associated Colleagues**

36. In February 2022, Plaintiff was named Uber Tech Lead (UTL) of Alerting with 2 teams

under her purview (AlertManager and Cloud Alerting).

37. As noted above prior to her assignment as UTL, Plaintiff had received "Exceeds Expectations" and for the year 2020/2021 received a "Strongly Exceeds Expectations."

38. At the time of her assignment to UTL Plaintiff reported to Rajeev Dayal, a Senior Engineering Manager of Alerting Infrastructure.

39. As UTL in fact she worked as part of a group of UTLs among which she was the only L6, all other UTLs and were performing the exact same roles as Plaintiff but were leveled at L7 and possibly L8.

40. As UTL, she and her colleagues' jobs consisted of maintaining backend infrastructure, applications, and frontend webpages to support the monitoring and alerting needs of internal Google developers and Google Cloud Platform customers.

41. Plaintiff was one of only two female UTLs on the team (the team being the wider organization in charge of observability reporting to Dimitris Nakos, Senior Engineering Director), the other UTLs being men.

42. Plaintiff was the only Arab UTL. All other UTLs were non-Arab.

43. The other female UTL Michelle Burroughs, non-Arab female, left. For all intents and purposes, Plaintiff was the only female and only person of Arab ethnicity on the teams. She was also the only person associated with Palestinians on the teams.

44. Plaintiff in her role as UTL was performing the role of at least an L7 and was mis-levelled as an L6.

45. The pay disparity between Plaintiff and her male and/or non-Arab and/or non-Palestinian-associated comparators was not based on a seniority system, a merit system, or a system that measures earnings by quantity or quality of production.

46. The pay disparity between Plaintiff and her male and/or non-Arab and/or non Palestinian-associated comparators was not based on any factors that are job-related and consistent with a business necessity.

**Fall 2022: Plaintiff's Disparate Pay And Denial Of Promotion Due To Her Gender And/Or Arab Ethnicity And/Or Association With Palestinians**

47. By fall 2022, Rajeev Dayal recommended Plaintiff for promotion to L7, Senior Staff Software Engineer, with a raise on average of $200,000 in salary, bonus and stock, and bump in title to correct the mis-levelling.

48. Dayal recognized and repeatedly told Plaintiff she was performing the role of an L7 and was mis-levelled.

49. During the promotion process, Dayal departed Google and his skip-level manager Dave Mandelbaum acted as her direct supervisor for all purposes.

50. Under the promotion procedure adopted in 2022 and applicable at the time of Plaintiff's candidacy, the supervisor speaking for the candidate makes the case on their behalf, the discussion group is composed of peers chosen by the relevant director(s) and the final decision is made by the directors.

51. Upon information and belief, in spite of Plaintiff's exceptional qualifications, and highly rated performance Mandelbaum did not support her promotion to correct her mis-leveling due to her gender and/or Arab ethnicity.

52. Plaintiff was denied promotion in the fall of 2022, which would have merely acknowledged the role she had already performed. For all intents and purposes, Plaintiff was working as a L7.

53. Though Google considered Plaintiff a key technical lead, Google paid her less than her

male and/or non-Arab and/or non Palestinian-affiliated colleagues for performing substantially equal or better work than them until her wrongful termination.

**2023: Plaintiff's Mis-Levelling Is Again Confirmed By Vikram Kumar, And Dave Mandelbaum Engages In A Pattern of Failing To Promote Women And Employees of Arab Origin**

54. Indeed, in early 2023, Plaintiff was approached by another observability director, Vikram Kumar, who recognized her contribution, and informed her that his conversations with others in the organization suggested that Plaintiff was an exceptional performer who had been "overlooked."

55. He invited Plaintiff to apply to transfer to his team and also confirmed that she was promotable to L7, that he would put her up for promotion as soon as possible, and that he would do everything possible to get her the professional recognition she clearly deserved.

56. This admission that Plaintiff was overlooked as compared with her male counterparts, confirmed what she had long known from her participation in various promotion committees: that women were consistently mis-levelled, undercompensated, and denied promotion by the company, and that Mandelbaum and the rest of the directors in her organization held women and Arab candidates to a higher standard for promotion than they did male candidates.

57. Mandelbaum's failure to officially promote Plaintiff to a level she already performed, which multiple other senior managers recognized, is consistent with a history of bias by Mandelbaum.

58. For example, in 2022 before Mandelbaum was Plaintiff's manager, upon information and belief, he used his position on a promotion committee to veto a qualified Arab candidate's promotion.

60. In one case, Mandelbaum and other directors in the fall of 2023, ranked the two female

candidates lowest in a group of L5 candidates going up for promotion to L6, based in one case on discriminatory stereotypes regarding communication style. Only when Plaintiff raised the biased nature of the criticism did the directors correct the evaluation and clear the two female candidates for promotion.

**Gender Discrimination Appears to be Part of Google's Corporate Culture**

61. The issue of gender bias was not limited at Google to Mandelbaum based on unverified feedback that wasn't shared with the promotion committee.

62. In 2022, Google settled a class action lawsuit under the Equal Pay Act brought by three women in California alleging that Google systematically underpaid female employees in California.

63. In 2023, Google was found liable for having mis-levelled Ulku Rowe, a cloud software engineer based in New York and denied her promotion due to her gender.

64. Barriers to equal pay for women were present also in Google's failure to formally promote Plaintiff in despite various managers' admissions that the work she was doing was mis-leveled at L6 and she should have been paid at least as an L7.

65. Mandelbaum's propensity to discriminate in failing to promote other qualified Arabs and women as set forth above is evidence that his animus, consistent with a corporate culture, influenced his decision not to promote Plaintiff.

66. At the time of Mandelbaum's decision not to support Plaintiff's promotion, and thereby stymie her promotion, as set forth below, he was also aware of her association with and efforts to not retaliate against those Google employees who opposed Project Nimbus, and by extension, Plaintiff's association in support of Palestinians.

67. At all times relevant from February 2022 to Plaintiff's termination on April 17, 2024,

Plaintiff was subjected to disparate pay because of her gender and/or Arab ethnicity and/or her association with Palestinians and her failure to promote due to the same was never remedied.

**December 4, 2023: After The War On Gaza, Plaintiff Is Ostracized And Subjected to Disparate Work Rules As An Arab and On Account of Her Association With Palestinians, Creating a Hostile Working Environment**

68. After Plaintiff was denied promotion by Mandelbaum in the fall of 2022 and with the advent of the Gaza War in the fall of 2023, Plaintiff was increasingly subjected to anti-Arab bias by the Company.

69. Shortly after October 7, 2023, Israel's war ostensibly on "Hamas" —truly a war against the whole of the Palestinian people in Gaza— began, Plaintiff found herself again targeted due to her Arab ethnicity, for her association with Palestinians and her protest of unlawful activity by the company.

70. On December 4, 2023, Plaintiff noticed a meme stating "Israel will prevail" which was circulated on Google's internal platform Memegen by a Google employee.

71. In response, Plaintiff flagged it for the Internal Community Moderation Team ("ICMT") as against Google's Community Guidelines: as "'category: 'Explicit', Subcategory: 'Violent', Explanation: '"will prevail" is a scary statement when associated with a state dropping 2000-pound bombs on civilians. As an Arab, I see it as a threat of violence" she wrote.

72. Plaintiff unequivocally stated that she felt threatened by the statement as an Arab employee.

73. By this time, the genocidal intent of Israel's military mission was abundantly clear:

"On October 12, when the Israeli military ordered one million Palestinians in northern Gaza to "evacuate" to southern Gaza within 24 hours, the Minister of Energy and Infrastructure said, "Humanitarian aid to Gaza? No electrical switch will be turned on, no water hydrant will be opened and no fuel truck will enter until the Israeli abductees are returned home." He later said "They will not receive a drop of water or a single battery *until they leave the world*." On October 13, Israeli President Isaac Herzog announced: "It

is an entire nation out there that is responsible. It is not true this rhetoric about civilians not being aware, not involved. It's absolutely not true." Israeli Defense Minister Gallant stated: "Gaza won't return to what it was before. *We will eliminate everything*.""[1]

74. The ICMT emailed Plaintiff and stated that the post was not in violation of community guidelines and would not be taken down, despite Plaintiff's protest that she felt it was threatening and discriminatory.

75. While, on October 12, 2023, ICMT added an addendum to their guidelines stating that employees should avoid discussing the events unfolding in Israel/Palestine, but if an employee wishes to post, it should be in support of their colleagues, and the Israel meme was posted before the addendum and grandfathered in, ICMT reserved the right to adjust verdicts for these grandfathered memes.

76. Despite their promise to re-evaluate the Israel meme, the moderation team did not take it down.

77. Plaintiff later learned from fellow employees of Palestinian and/or Arab and/or Muslim origin that they had repeatedly reported that meme too in December 2023 and in later months, that they met with the ICMT to discuss the matter, but the moderation team refused to change their stance.

78. To demonstrate the clear double standard the Company was employing, in response to the complaint going unanswered Plaintiff asked the Company, "If I go ahead and make a meme with the Palestinian flag and the text 'Palestine will prevail,' are you saying it will be ok? I assumed it wouldn't but if it is, I'll go ahead and do so."

79. Receiving no response, Plaintiff posted the meme the following day. After three hours, it

---

[1] As cited in *Defense for Children International—Palestine v Biden et al* 3:23-cv-05829 (Northern District of California) Document 1 Filed 11/13/23 Page 7 of 89, paragraph 16, Defense for Children International

was taken down and ICMT informed Plaintiff that her comment was deemed "disruptive" and in violation of the addendum.

80. Plaintiff also was informed "the violation contributed to a temporary (2-day) Memegen ban and your manager will be notified."

81. It was clear that Plaintiff was being treated differently as an Arab than her non-Arab colleagues, and as a person associated with people of Palestinian national origin, in connection with expressing viewpoints at work.

82. Moreover, it was apparent to Plaintiff that the Community Guidelines were being selectively enforced and the moderation team was discriminating in their application of the guidelines based on the employee's ethnicity, cultural background, national origin, association, and/or religion of the complainant.

83. In fact, Plaintiff was being reported to her manager on account of these views as an Arab in support of Arabs and due to her association with people of Palestinian national origin.

**January 2024: Plaintiff Receives A Lower Rating After She Is Further Identified With Palestinians**

84. Around the time of the "Israel will prevail" meme incident, Plaintiff started posting about Nimbus and Gaza in the Understand Your Company (UYC) chatroom.

85. This UYC chatroom had historically been used to discuss Google, its policies, and its products, and it was initially started by employees who used it to organize multiple campaigns around gender discrimination, sexual harassment, labor rights, retaliation, unethical contracts, compensation cuts, and other employment related matters.

86. Plaintiff was the sole manager of that chatroom at the time.

87. It was clear that many employees held anti-Arab animus, one person asking why Palestinians bothered to have children.

88. On December 11, 2023, an employee posted an announcement to UYC about a rally in front of the Google San Francisco office on December 14th where employee, other tech workers, and concerned citizens were going to protest Project Nimbus and how Israel is using AI to kill Palestinians.

89. At this time, Plaintiff was involved in a discussion regarding genocide in the UYC chatroom pointing out that 20,000 Palestinians have been killed, and discussing Google's complicity in these acts.

90. On December 14, 2023, ICMT took the unprecedented step of inserting themselves as explicit space managers of the UYC chatroom, effectively displacing Plaintiff as moderator. It was not their purview to moderate private chat spaces (only discoverable chat spaces are).

91. Never before had Plaintiff seen this step taken. She reasonably believed that her statements in support of Palestinians and in support of her and other Arabs were being interfered with.

92. On January 12, 2024, Plaintiff started a thread regarding https://techforpalestine.org/ (a coalition of volunteers who are people in tech and working towards Palestinian freedom).

93. On January 29, 2024, Plaintiff's manager Dave Mandelbaum informed her that her rating fell from Outstanding Impact (2nd highest rating) to Significant Impact (a "passing" grade and 1 notch below O). Plaintiff's performance did not change in this period, and her rating was unwarranted. Plaintiff's compensation package is directly related to her rating and the lower rating effectively precluded promotion.

94. Thus, Plaintiff was negatively rated due to her advocacy on behalf of other Arabs and Palestinians, which the Company opposed.

**March 2024-On: Plaintiff Suffers A Hostile Work Environment Based On Her Arab Ethnicity And Her Association With Arab Google Employees Including Palestinians: Plaintiff Faces An  Escalating Hostile Work Environment And Doxxing**

95. Despite the retaliatory rating Plaintiff did not cease her association with Palestinians.

96. In February 2024, Plaintiff also joined the Google branch of No Tech for Apartheid.

97. In the process of learning more about the No Tech for Apartheid ("NOTA") group, Plaintiff learned about the multiple instances of harassment, discrimination, and doxxing that they had been subjected to for speaking up about Project Nimbus, for being Palestinian or Arab or Muslim, or for showing support for Palestine and/or being associated with Palestinians.

98. A member told Plaintiff that they were harassed for wearing a watermelon shirt to the office and were asked by their Supervisor to stop wearing it. The main leader in NYC told Plaintiff that they were doxxed on February 13th and an anti-Palestinian employee had been stalking them at the NYC office.

99. Others in the group told Plaintiff that they were accused by other employees of supporting terrorism because they shared the Drop Nimbus petition or because they wore a keffiyeh (Palestinian scarf) to the office. They also told her that, despite them filing multiple Employee Relations (ER) complaints about these incidents, Google did not act to stop the harassment.

100.   Plaintiff also had engaged in these same acts, wearing her keffiyeh at work consistently since the war on Gaza began in October 2023 and by signing and sharing the Drop Nimbus petition.

101.   Plaintiff suggested that the group document these incidents and share them with fellow workers to highlight how Google wasn't enforcing its own Code of Conduct and was not protecting its workers.

102.   In March 2024, Plaintiff continued her advocacy on behalf of Palestinians. She

continued protesting the Company's complicity in genocide against them through Project Nimbus. She continued protesting internal animus against Arabs and people associated with Palestine.

103.    Plaintiff continued to experience anti-Arab and anti-Palestinian hostility directed to her as a person associated with Palestinians from the Company.

104.    On March 6, 2024, in connection with International Women's Day, Plaintiff placed the following question in the associated Dory board:

> "Google has a cloud contract w/ the Israeli gov under Project Nimbus to support its military which is currently killing, starving & denying medical care to women in Gaza. To avoid complicity in war crimes & respect its principles, should Google cancel it and stop taking money from the Israeli gov?".

105.    Plaintiff added links to a UN Women Report containing statistics showing the impact of the Israeli genocide on Gazan women, a link to the Drop Nimbus petition, to FAQS about Project Nimbus, to the AI principles, and to the International Court of Justice ruling finding that it is plausible that Israel's acts could amount to genocide in Gaza.

106.    By this post on March 6, 2024, Plaintiff engaged in protected activity of protesting what she believes to be an employer activity on violation of the Genocide Convention.

107.    Upon information and belief, a group of anti-Palestinian employees circulated Plaintiff's question and requested that participants downvote the question.

108.    Upon information and belief, the anti-Palestinian/anti-Arab group engaged in a biased campaign to make repeated bad-faith reports against Plaintiff due to her statements in support of Palestinians and against their genocide.

109.    On March 7, 2024, the anti-Arab/anti-Palestinian hostility was specifically targeted against Plaintiff as an Arab, as an employee speaking out against genocide, and as a person associated with Palestinians.

110.    On Google "Memegen," a platform to create memes internally, there was a targeted

campaign against her.

111.  Prominent proponents of the genocide started posting memes about Plaintiff, accusing her of "ruining International Women's Day ("IWD") with her predictably hateful agenda," accusing her of "supporting terrorists who use sexual violence as a weapon of war on IWD."

112.  Plaintiff reported the memes to Google and mentioned the attacks in the Women@ chatroom.

113.  On March 7 and 8, 2024, memes and chat messages were posted about Plaintiff, falsely accusing her of supporting terrorism, or being an anti-Semite, that she ruined International Women's Day and that she was creating a hostile work environment. Plaintiff reported these false accusations to ICMT and they took down some but not all of the attacks on her.

114.  Plaintiff is not and has never been anti-Semitic. She understands the difference between the Jewish people and the actions of the Israeli government are not the same.

115.  Unfortunately, there are those at Google who conflate criticism of the Israeli government actions with anti-Semitism in an attempt to divert attention from heinous and illegal actions of the Israeli government.

116.  On March 8, 2024, Plaintiff received an email from Google Security informing her that she had been doxxed, that is, her name, work location, and internal Google profile picture was included in a Daily Wire press article.

117.  The article contained screenshots of Plaintiff's question from the International Women's Day Dory, in addition to screenshots of questions and comments of 5 other employees in the same Dory, mostly from Palestinian and/or Muslim and/or Arab backgrounds, all of whom opposed genocide and who were associated with Palestinians. The article followed the same line of attack that was used against Plaintiff the previous two days by other employees.

118.   Plaintiff told Google Security that she had already been doxxed in 2019 after circulating a petition in support of trans employees and against the inclusion of a person known to be hostile to trans persons in the Employer's newly announced advisory board.

119.   Plaintiff suggested to Google Security that she had some ideas as to how to find the culprit. Plaintiff filed a ticket with her tips and technical advice on March 12, 2024.

120.   Plaintiff also filed an ER complaint about being doxxed by someone at the company.

121.   Plaintiff never heard back from Security of Google regarding either matter.

122.   Plaintiff reasonably believed her Employer was not respecting its own Code of Conduct which puts the onus on it and everyone at the company to stop harassment and discrimination: "doxxing is an invasion of privacy which is meant to inflict emotional distress and is specifically prohibited by the Employer's Policy on Harassment, Discrimination, Retaliation, Standards of Conduct, and Workplace Concerns. Doxxing also creates an unsafe work environment for the doxxed employee since the victim has to continue working around their harasser."

123.    Plaintiff also reasonably believed the Employer was selectively applying its Code of Conduct and Policy on Harassment, Discrimination, Retaliation, Standards of Conduct, and Workplace Concerns by allowing the culture of harassment and doxxing to continue against a protected class of employees (Palestinian, employees associated with Palestinians, Arabs, and Muslims).

124.   Plaintiff's personal safety was placed at risk by the malicious leak. Her Google username and location were also leaked.

125.   After the doxxing incident, the nature of the Company's opposition to Plaintiff was

again demonstrated on March 11, 2024, when the ICMT removed two threads she had posted referencing violations of the human rights of other Arabs and Palestinians. These statements were deemed violations of Google's Community Guidelines, while statements in support of Israel were not. The ICMT also deleted Plaintiff's post of showing United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)'s statement in support of a ceasefire in Gaza, from a thread about numerous unions' support for a ceasefire.

126.    Plaintiff was the only moderator of the chatroom and was targeted for her association with Palestinians and because she is Arab.

127.    Throughout this period, Plaintiff was thus subject to a hostile work environment due to her race and/or Arab ethnicity and because of her association with Palestinians.

**March 13, 2024: Plaintiff Is Repeatedly Warned By Mandelbaum**

128.    On or about March 13, 2024, Plaintiff had a routine weekly meeting with her manager, Dave Mandelbaum.

129.    At the meeting, Mandelbaum remarked that he saw the article where she had been doxxed. Mandelbaum then told her to "be careful," and stated that her posting the questions she did was "risky."

130.    Mandelbaum repeated multiple times that Plaintiff should be careful. After they finished the meeting, on chat, Plaintiff asked Mandelbaum how he knew she got doxxed because ER said that their investigation was confidential.

131.    Mandelbaum said that other people shared the article with him, but he did not identify anyone. Plaintiff felt the warnings to be careful from Mandelbaum amounted to a veiled threat.

**March 14, 2024: Plaintiff Engages In Protected Activity Making A Discrimination Complaint To Employee Relations**

132. On March 14, 2024, Plaintiff submitted a complaint to Employee Relations regarding the racial and/or ethnic harassment, she had suffered since October 7, 2023.

133. Plaintiff also cited the sections of the Code of Conduct that these employees were violating. Plaintiff filed this complaint with ER in order for the Employer to take action against the employees who were harassing and bullying her.

134. Plaintiff never heard back from Employee Relations regarding her protected complaint or to remedy the hostile work environment.

**Plaintiff's Offer Of Transfer Is Blocked In Retaliation For Her Complaint Regarding Discrimination And Unsafe Working Conditions**

135. After Plaintiff made her protected March 14, 2024, complaint, the retaliation was immediate.

136. Previously, in mid-January in one of Plaintiff's regular meetings with another director, Vikram Kumar, Kumar discussed the possibility of Plaintiff moving to his team.

137. From January to March, Mandelbaum and Dimitris Nakos effectively stalled the effort for her to transfer to Kumar's team, over Kumar's apparent objection.

138. That is, after Plaintiff's complaint, her planned transfer went nowhere, whereas in January 2024 before her complaint to ER it was still very much a possibility.

139. This transfer would also have offered Plaintiff the opportunity for further advancement and promotion, as previously stated by Kumar and the blocked transfer thereby also blocked a contemplated promotion to L7.

**April 16, 2024: Plaintiff's Protest Of Discrimination And Unsafe Working Conditions By Engaging In A Sit In Led To Her Retaliatory Wrongful Termination**

140. In late March 2024, Plaintiff participated in planning Google's No Tech for Apartheid

protest demanding the cancellation of Project Nimbus, that Google address the harassment, intimidation, bullying, silencing, and censorship of Palestinian, Arab, Muslim employees and that Google address the mental health crisis among Google employees caused by Project Nimbus.

141.  Plaintiff focused on addressing the harassment issue: Plaintiff co-wrote a document called "Google disregards worker safety" which listed all incidents of harassment, intimidation, doxxing, etc., and which parts of the Code of Conduct harassers violated, and how Google failed to provide a physically and psychologically safe work environment for its workers.

142.  In part, Plaintiff was protesting her own harassment. The document was mentioned in the email template that members of the group used when emailing their teams to let them know of their participation in the protest.

143.  The protest was to occur at Google offices in New York, Sunnyvale (main campus for the cloud division), and Seattle.

144.  Plaintiff was tasked to de-escalate any conflict during the protest.

145.  In the New York office there were more than a dozen employees participating in the sit-in. Many of the participants had been subject to harassment, doxxed, intimidated or physically stalked.

146.  The sit-in occurred on April 16, 2024. Among the demands of those sitting in was that the Company:

> "Stop the harassment, intimidation, bullying, silencing, and censorship of Palestinian, Arab, Muslim Googlers: We demand that Google leadership immediately halt its continuous empowerment of hate, abuse, and retaliation against those who speak out and establish a working environment where Muslim, Arab, and Palestinian Googlers are not subject to harassment, racism, and collusion against them."

147.  The demands thus protested then-ongoing discrimination against Arab employees, Muslim employees, and Palestinian-associated employees.

148.    The sit-in also protested the unsafe working conditions of Arab employees, Muslim employees, and Palestinian-associated employees.

149.    On that day, Plaintiff reported to work, attended a work meeting and then after the meeting, finalized an email to her larger work group (about 200 people including managers). This email stated that Plaintiff was participating in the sit-in to protest Project Nimbus and the role Google is playing in the Gaza War. She stated that as a Cloud software engineer, she was concerned that her work at Google Cloud was enabling genocide.

150.    Plaintiff also stated the group's demands and how Google failed to provide a safe workplace by allowing the discriminatory harassment she and others were facing. Plaintiff also provided a link to the "Google disregards worker safety" document she previously participated in drafting.

151.    Plaintiff identified herself supporting the protest by wearing a t-shirt which had "Googler against Genocide" on the front and "Drop Project Nimbus" on the back. Everyone participating in the protest wore that t-shirt. Plaintiff and her fellow protesters by their protest were thus engaging in protected activity regarding racial/ethnic, religious and Palestinian-associated harassment they and others suffered; they were raising protests of worker safety, and violations of the Genocide Convention and other international and domestic law by their protest action and related communications.

152.    At the time of the protests, Plaintiff was aware of the ruling of January 26, 2024, by the International Court of Justice and its findings in the South Africa Case that a plausible case of genocide had been made out by South Africa in its papers and proof, and provisional measures ordered to stop the major aspects of the assault. Plaintiff suspected Defendant was not being transparent about the use the Israeli Military was making of the service provided through Project

Nimbus aiding or abetting Israeli military efforts in Gaza. Subsequently it has been reported in the news that Googles' Project Nimbus was used by the Israeli military in its war with Hamas. See https://www.wired.com/story/amazon-google-project-nimbus-israel-idf.  This news story in Wired is based on public statements by Israeli officials which contradict Google's public statements. Google insists that the Israeli ministries which use the Cloud-based Project Nimbus must agree to comply with Google's  Terms of Service and Acceptable Use Policy" Policy but the Israeli officials say otherwise.

153.  With respect to her protest of genocide, Plaintiff was also protesting a violation of domestic law.

154.  In 1988, the Reagan administration and the Senate ratified the Genocide Convention which was the ratification of a treaty. At the same time Congress passed the laws which implemented the punishments for genocide according to the terms of the convention, 19 USC 1091.  By virtue of Article VI section 2 (supremacy clause) which includes treaties ratified by Congress as part of the supreme law of the land, the Genocide convention is domestic law and applies directly to individuals.

155.  As the protest began Plaintiff then went down to the 10th floor where the sit-in was to happen.  The sit-in happened on the 10th floor in a lounge area where there are seats and a small kitchen with beverages and snacks.

156.  Plaintiff and others participating in the action peacefully distributed leaflets and gave speeches.

157.  Plaintiff and other participants were harassed and filmed by several employees who disagreed with them.

158.  Google security appeared and Plaintiff and other protest organizers constructively

engaged with them, quieting the protest, ensuring that they were not blocking lounge access or

disturbing others using the space. When eventually, Google security threatened to call the police

if protesters did not leave Plaintiff covered her shirt and ended her protest. At this time the

majority of protesters had dispersed.  Around 6pm, Plaintiff departed.

159.   While Plaintiff was heading home, she noticed that she could not access her work

email. When she got home, she could no longer log into her work laptop.

160.   Plaintiff then received an email from Google on her personal email account stating that

she was being put on administrative leave immediately

161.   The email did not state why Plaintiff was being placed on administrative leave. She

learned later that night that other employees who participated in the protest were also put on

administrative leave.

162.   On April 17, 2024, in the evening, around 8pm, Plaintiff received an email from

Google which stated that her employment was being terminated as of that day.

163.   The email stated that after a review of Plaintiff's conduct from April 16th, it was

determined that she violated Google's workplace policies. Specifically, it stated that she violated

the Code of Conduct and the Policy on Harassment, Discrimination, Retaliation Standards of

Conduct, and Workplace Concerns. Plaintiff learned later that night that around 28 more

employees were terminated.  In total 50 employees were wrongfully fired in connection with the

protests in New York, Seattle and Sunnyvale for inter alia, their association with Palestinians.

164.   The Company's claim of policy violations by Plaintiff was false. There was nothing

about her participation in the protest which violated any part of the aforementioned policy. In fact

Plaintiff's protest consisted of protected activity protesting harassment she and other Arab and

Palestinian-associated employees suffered in violation of the law and of Google's policy which had gone entirely unaddressed.

165.  Plaintiff had previously noted a clear double standard in the handling of complaints regarding discrimination against Arab, Muslim and Palestinian and Palestinian-associated employees.

166.  Nor was Plaintiff fired for the fact of the protest.

167.  Plaintiff previously engaged in a walkout and a sit-in without any discipline imposed.

168.  Indeed, Google employees had engaged in mass protest activity repeatedly across the country beginning with the Google walkouts regarding arbitration, and other mass actions unrelated to Palestine, for several years without being terminated for the mere participation in such actions.

169.  Clearly, Plaintiff's employment was terminated was due to her association with Palestinians and/or retaliation for her complaints of anti—Arab racial or ethnic bias, or for whistleblower activities protesting the unlawful unsafe conditions at Google, and her protest of Google's complicity in genocide.

170.  Moreover, until Plaintiff's last day actually on the job, April 16, 2024, before she was placed on leave and fired on April 17, 2024, the company allowed her to be harassed and subjected to a hostile work environment as a continuing violation as described above.

171.  From the time, Plaintiff raised the concerns about how Google was addressing concerns of participating in a genocide and she raised concerns about the harms to the Palestinian people, Plaintiff was continually harassed and then her employment terminated for pretextual reasons due to her Arab ethnicity, her association with individuals of Palestinian national origin and/or in retaliation for making a complaint of discrimination.

172.  As a result of Google's wrongful acts, Plaintiff has suffered reputational harm, depression, tearfulness, humiliation, and loss of self-esteem.

## FIRST CAUSE OF ACTION
### (DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT DUE TO ARAB ETHNICITY IN VIOLATION OF TITLE VII)

173.  Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

174.  Defendant has discriminated against Plaintiff on the basis of her Arab ethnicity in violation of Title VII of the Civil Rights Act of 1964 by subjecting Plaintiff to disparate treatment, disparate work rules, based upon her Arab ethnicity including, and also subjecting her to a hostile work environment.

175.  As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### (DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN VIOLATION OF TITLE VII)

176.  Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

177.  Defendant has discriminated against Plaintiff on the basis of her association with people of Palestinian National Origin in violation of Title VII of the Civil Rights Act of 1964, by subjecting Plaintiff to disparate treatment and disparate work rules based upon her association with Palestinians including, and also subjecting her to a hostile work environment.

178.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
### (DISPRATE PAY DUE TO ARAB ETHNICITY IN VIOLATION OF TITLE VII)

179.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

180.  Defendant has discriminated against Plaintiff on the basis of her Arab ethnicity in violation of Title VII of the Civil Rights Act of 1964, by subjecting Plaintiff to disparate pay based upon her Arab ethnicity.

181.  As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
### (DISPARATE PAY DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN
### NATIONAL ORIGIN IN VIOLATION OF TITLE VII)

182.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

183.   Defendant has discriminated against Plaintiff on the basis of her association with people of Palestinian national origin in violation of the Title VII of the Civil Rights Act of 1964, by subjecting Plaintiff to disparate pay based upon her association with Palestinians.

184.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to

suffer, monetary and/or economic harm for which she is entitled to an award of monetary

damages and other relief.

## FIFTH CAUSE OF ACTION
### (DISPARATE PAY DUE TO GENDER IN VIOLATION OF TITLE VII)

185.   Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

186.   Defendant has discriminated against Plaintiff on the basis of her gender in violation of

the Title VII of the Civil Rights Act of 1964  by subjecting Plaintiff to disparate pay based upon

her gender.

187.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to

suffer, monetary and/or economic harm for which she is entitled to an award of monetary

damages and other relief.

## SIXTH CAUSE OF ACTION
### (WRONGFUL TERMINATION DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN VIOLATION OF TITLE VII)

188.   Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

189.   Defendant has discriminated against Plaintiff on the basis of her association with

people of Palestinian national origin in violation of the Title VII of the Civil Rights Act of 1964,

by subjecting Plaintiff to wrongful termination based upon her association with Palestinians.

190.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to

suffer, monetary and/or economic harm for which she is entitled to an award of monetary

damages and other relief.

## SEVENTH CAUSE OF ACTION
## (WRONGFUL TERMINATION DUE TO RETALIATION IN VIOLATION OF TITLE VII)

191.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

192.    Defendant has retaliated against Plaintiff on the basis of her protected activity in

violation of the Title VII of the Civil Rights Act of 1964, by subjecting Plaintiff to wrongful

termination.

193.    As a direct and proximate result of Defendant' unlawful retaliatory conduct in violation

of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to suffer,

monetary and/or economic harm for which she is entitled to an award of monetary damages and

other relief.

## EIGHTH CAUSE OF ACTION
## (RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII)

194.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

195.    Defendant has retaliated against Plaintiff on the basis of her protected activity in

violation of the Title VII of the Civil Rights Act of 1964, by subjecting Plaintiff to a hostile work

environment.

196.    As a direct and proximate result of Defendant' unlawful retaliatory conduct in

violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and continues to

suffer, monetary and/or economic harm for which she is entitled to an award of monetary

damages and other relief.

**NINTH CAUSE OF ACTION**
**(DISCRIMINATION, HARASSMENT, AND HOSTILE WORK ENVIRONMENT DUE**
**TO ARAB ETHNICITY IN VIOLATION OF THE NYCHRL)**

197.   Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

198.   Defendant has discriminated against Plaintiff on the basis of her Arab ethnicity in

violation of the NYCHRL by subjecting Plaintiff to disparate treatment, disparate work rules,

based upon her Arab ethnicity including, and subjecting her to a hostile work environment.

199.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm for which she is entitled to an award of monetary damages and other relief.

**TENTH CAUSE OF ACTION**
**(DISCRIMINATION, HARASSMENT, AND HOSTILE WORK ENVIRONMENT DUE**
**TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN**
**VIOLATION OF THE NYCHRL)**

200.   Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

201.   Defendant has discriminated against Plaintiff on the basis of her association with

people of Palestinian national origin in violation of the NYCHRL, by subjecting Plaintiff to

disparate treatment and disparate work rules based upon her association with people of Palestinian

national origin including, and also subjecting her to a hostile work environment.

202.   As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## ELEVENTH CAUSE OF ACTION
## (DISPARATE PAY DUE TO ARAB ETHNICITY IN VIOLATION OF THE NYCHRL)

203.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

204.    Defendant has discriminated against Plaintiff on the basis of her Arab ethnicity in violation of the NYCHRL, by subjecting Plaintiff to disparate pay based upon her Arab ethnicity.

205.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## TWELFTH CAUSE OF ACTION
## (DISPARATE PAY DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN VIOLATION OF THE NYCHRL)

206.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

207.    Defendant has discriminated against Plaintiff on the basis of her association with people of Palestinian national origin in violation of the NYCHRL, by subjecting Plaintiff to disparate pay based upon her association with Palestinians.

208.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## THIRTEENTH CAUSE OF ACTION
## (DISPARATE PAY DUE TO GENDER IN VIOLATION OF THE NYCHRL)

209.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

210.    Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate pay based upon her gender.

211.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## FOURTEENTH CAUSE OF ACTION
## (WRONGFUL TERMINATION DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN VIOLATION OF THE NYCHRL)

212.  Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

213.  Defendant has discriminated against Plaintiff on the basis of her association with people of Palestinian national origin in violation of the NYCHRL, by subjecting Plaintiff to wrongful termination based upon her association with Palestinians.

214.  As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## FIFTEENTH CAUSE OF ACTION
## (WRONGFUL TERMINATION DUE TO RETALIATION IN VIOLATION OF THE NYCHRL)

215.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

216.    Defendant has retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL, by subjecting Plaintiff to wrongful termination.

217.    As a direct and proximate result of Defendant' unlawful retaliatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm for which she is entitled to an award of monetary damages and other relief.

**SIXTEENTH CAUSE OF ACTION**
**(RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE**
**NYCHRL)**

218.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

219.    Defendant has retaliated against Plaintiff on the basis of her protected activity in

violation of the NYCHRL, by subjecting Plaintiff to a hostile work environment.

220.    As a direct and proximate result of Defendant' unlawful retaliatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm for which she is entitled to an award of monetary damages and other relief.

**SEVENTEENTH CAUSE OF ACTION**
**(DISCRIMINATION-FAILURE TO PROMOTE DUE TO ARAB ETHNICITY IN**
**VIOLATION OF THE NYCHRL)**

221.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

222.    Defendant has discriminated against Plaintiff on the basis of her Arab ethnicity in

violation of the NYCHRL, by failing to promote based upon her Arab ethnicity.

223.  As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm for which she is entitled to an award of monetary damages and other relief.

**EIGHTHEENTH CAUSE OF ACTION**
**(DISCRIMINATION-FAILURE TO PROMOTE DUE TO ASSOCIATION WITH**
**PEOPLE OF PALESTINIAN NATIONAL ORIGIN IN VIOLATION OF THE NYCHRL)**

224.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

225.    Defendant has discriminated against Plaintiff on the basis of her association with people of Palestinian national origin in violation of the NYCHRL, by failing to promote Plaintiff based upon her association with people of Palestinian national origin.

226.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

**NINETEENTH CAUSE OF ACTION**
**(DISCRIMINATION-FAILURE TO PROMOTE DUE TO GENDER IN VIOLATION OF THE NYCHRL)**

227.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

228.    Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by failing to promote Plaintiff based upon her gender.

229.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

**TWENTIETH CAUSE OF ACTION**
**(RETALIATION-FAILURE TO PROMOTE DUE TO PROTECTED ACTIVITY IN VIOLATION OF THE NYCHRL)**

230.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

231.    Defendant has retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by failing to promote Plaintiff.

232.    As a direct and proximate result of Defendant' unlawful discriminatory conduct in

violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

## TWENTY-FIRST CAUSE OF ACTION
### (PAY DISPARITY PURSUANT TO NYLL 194(d) (DUE TO GENDER)

233.  Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

234.   Based on those allegations, Defendant subjected Plaintiff to disparate pay on the basis of gender by paying Plaintiff approximately $200,000 less than her similarly situated male colleagues due to her gender from February 2022 to April 2024 for her work as Software Engineer, while she performed equal work, which required equal skill, effort, and responsibility, and under the same working conditions and at the same establishments or establishment within the same county.

235.   The pay discrepancy between men and women cannot be accounted for by a seniority system; (b) a merit system; or (c) any factor other than sex or any bonafide factor other than sex.

236.   Plaintiff seeks to recover her unpaid compensation, and treble damages pursuant to the NYLL, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### (PAY DISPARITY PURSUANT TO NYLL 194(d )(DUE TO ARAB ETHNICITY)

237.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

238.   Based on those allegations, Defendant subjected Plaintiff to disparate pay on the basis of her Arab ethnicity by paying Plaintiff approximately $200,000 less than her similarly situated non-Arab colleagues, due to her Arab ethnicity from February 2022 to April 2024 for her

work as Software Engineer, while she performed equal work, which required equal skill, effort, and responsibility, and under the same working conditions and at the same establishments or establishment within the same county.

239.   The pay discrepancy between Arabs and non-Arabs cannot be accounted for by a seniority system; (b) a merit system; or (c) any factor other than sex or any bonafide factor other than Arab ethnicity.

240.   Plaintiff seeks to recover her unpaid compensation, and treble damages pursuant to the NYLL, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.


### TWENTY-THIRD CAUSE OF ACTION
### (PAY DISPARITY PURSUANT TO NYLL 194(d) (DUE TO ASSOCIATION WITH PEOPLE OF PALESTINIAN NATIONAL ORIGIN)

241.  Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

242.  Based on those allegations, Defendant subjected Plaintiff to disparate pay on the basis of her associations with people of Palestinian national origin by paying Plaintiff approximately $200,000 less than her similarly situated non-Palestinian national origin associated colleagues from February 2022 to April 2024 for her work as Software Engineer, while she performed equal work, which required equal skill, effort, and responsibility, and under the same working conditions and at the same establishments or establishment within the same county.

243.   The pay discrepancy between non-Palestinian national origin associated and Palestinian national origin associated colleagues cannot be accounted for by a seniority system; (b) a merit system; or (c) any factor other than Palestinian national origin association.

244.   Plaintiff seeks to recover her unpaid compensation, and treble damages pursuant to the NYLL, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
## (NEW YORK LABOR LAW 740 RETALIATION)

245.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

246.   During the relevant time period NYLL section 740 prohibits an employer from retaliating against an employee who discloses to a supervisor an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation.

247.   Plaintiff reasonably believed that her employer was engaging in the crime of being complicit with Genocide. Genocide is outlawed under the Genocide Convention which was ratified in 1988, and corresponding implementing legislation was adopted as US law in 1988 in 18. USC 1091 at that time.

248.  Pursuant to Article VI section 2 of the United States Constitution, known as the supremacy clause, all ratified treaties are part of US law.

249.  The genocide convention as well as the implementing legislation requires all steps to be taken to prevent as well as prohibit and punish genocide and those complicit in it.

250.   The obligations under the Genocide Convention as US law are individual, and require all individuals including elected officials and corporate leaders to take steps to comply with the convention and not be complicit in genocide.

251.   Plaintiff reasonably believed that Defendant was engaging conduct which violated the

law regarding complicity with genocide as many international organizations including the International Court of Justice in January 2024 ruled in the case brought against Israel by South Africa, that a plausible case of genocide existed and required precautionary measures.

252.   When Plaintiff took part in the protest on April 16, 2024 at Google she was informing her supervisors that their continued participation in Project Nimbus was complicit with illegal genocide.

253.   Notwithstanding her activity protected under NYLL 740 she was terminated for the very conduct the genocide convention requires her to take to stop Google's complicity with genocide in Gaza through its funding for Project Nimbus. For a full analysis of the legal violations resulting from Project Nimbus see https://abolitionistlawcenter.org/wp-content/uploads/2024/12/Abolitionist-Law-Center-Submission-to-UN-Special-Rapporteur-on-the-Situation-of-Palestine.pdf

254.   Based on the foregoing Defendant violated Plaintiff's rights guaranteed to her under NYLL and NYLL as set forth in this complaint.

WHEREFORE, Plaintiff requests relief as follows:

A. An order declaring that the actions of Defendant alleged in this complaint violate Title VII, the NYCHRL and NYLL 740;

B. An award of compensatory damages in an amount that would fully compensate Plaintiff, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as

continued stress and anxiety caused by Defendant' violations of the law alleged in this complaint, in an amount to be determined at trial;

C. An award of punitive damages to Plaintiff in an amount that would punish Defendant for the willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter Defendant from future discrimination and other unlawful behavior, in an amount to be determined at trial;

D. All relief provided pursuant to NYLL 740 including but not limited to reinstatement, or frontpay in lieu thereof, backpay, costs, attorneys' fees and $10,000 civil penalty;

E. An award of all penalties available under the applicable laws;

F. An award of frontpay and backpay;

G. An award of reasonable attorneys' fees, the fees and costs of experts, and the costs of this action; and

H. Such other relief as this Court deems just and equitable.

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury trial on all issues of facts and damages.

Dated:  Brooklyn, New York
July 22, 2025

Respectfully submitted,
JULIEN MIRER & ASSOCIATES, PLLC

By: Ria Julien
Jeanne Mirer

Heather L. Ramirez
*Attorneys for Plaintiff*
300 Cadman Plaza, 12th Floor
Brooklyn, NY 11201
rjulien@julienmirer.com
jmirer@julienmirer.com